UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED COAL COMPANY, LLC,

          Plaintiff,

    – *against* –

XCOAL ENERGY AND RESOURCES,

          Defendant.

**OPINION & ORDER**

23 Civ. 5709 (ER)

RAMOS, D.J.:

United Coal Company, LLC ("United Coal") brings this action against Xcoal Energy and Resources ("Xcoal"), alleging that Xcoal failed to accept delivery of coal under two separate purchase orders. Before the Court is United Coal's motion for partial summary judgement and to strike expert testimony, Doc. 74, as well as Xcoal's cross motion for summary judgement and to strike expert testimony, Doc. 82. For the reasons set forth below, United Coal's motion to strike is GRANTED; United Coal's motion for partial summary judgment is GRANTED in part and DENIED in part; Xcoal's motion to strike is DENIED; and Xcoal's motion for summary judgment is DENIED.

## I.    BACKGROUND

### A.  Factual Background[1]

*1. The Parties*

---

[1] The following facts are drawn from parties' Rule 56.1 statements and responsive Rule 56.1 statements, Docs. 78, 84, 91 at 75–116, United Coal's supplemental Rule 56.1 statement, Doc. 91 at 116–19, Xcoal's response to that supplemental statement, Doc. 96, and the parties letters to the Court after oral argument was conducted, Docs. 103, 104.

However, the Court will not consider United Coal's reply Rule 56.1 statements, which it included in the same document as its responsive Rule 56.1 statements and its supplemental Rule 56.1 statements. *See* Doc. 91 at 3–74. After Xcoal's filed its responsive Rule 56.1 statement, Doc. 84, United Coal filed a reply. *Id.*

United Coal is an operating company which owns several coal mines in Central Appalachia through its subsidiaries, including the Wellmore Coal Company, which produces high-volatile metallurgical coal ("Wellmore Coal"), and the Pocahontas Coal Company, which produces Affinity low-volatile metallurgical coal ("Affinity Coal"). Doc. 84 ¶ 201.

Xcoal is an energy logistics and coal brokerage company which purchases coal from producers within the United States and sells that coal to customers around the world. *Id.* ¶ 193. At all relevant times, Ernie Thrasher, Sr. ("Thrasher Sr."), was the CEO and Chief Marketing Officer of Xcoal, and Ernie Thrasher, Jr. ("Thrasher Jr."), was the Vice President of Atlantic Operations. Doc. 78 at ¶¶ 1, 3. Both Thrasher Sr. and Thrasher Jr. were authorized to sign purchase orders for the purchase of coal. *Id.* ¶ 10.

### 2. *Xcoal and United Coal's Communications Prior to the Purchase Orders*

After an initial order of Wellmore and Affinity Coal earlier in the year,[2] in March 2022, Xcoal reached out to United Coal about the possibility of purchasing additional Wellmore and Affinity Coal. Doc. 84 ¶¶ 209–11, 214.

---

Xcoal argues that United Coal's replies are prejudicial, unfairly granting them the "proverbial 'last word.'" Doc. 95 at 7–8.

Courts in this district have split on whether to consider a party's Rule 56.1 reply. *Compare Adams v. Bloomberg L.P.*, No. 20 Civ. 724 (RA) (JLC), 2023 WL 2662607, at *2 (S.D.N.Y. Mar. 28, 2023) ("Local Civil Rule 56.1 does not provide for a reply in further support of a Rule 56.1 statement of undisputed facts, but it also does not prohibit such replies.") (internal quotation marks omitted) *with G.S. v. Pleasantville Union Free School District*, No. 19 Civ. 6508 (CS), 2020 WL 4586895, at n.2 (S.D.N.Y. Aug. 10, 2020) ("Local Rule 56.1 does not permit the filing of reply Rule 56.1 [s]tatements."). Courts have noted that a Rule 56.1 reply is especially unnecessary where the party can address those same issues in a brief. *Id.* ("[A] reply 56.1 statement is particularly unnecessary where, as here, the Court is considering cross-motions, and thus Defendant had the opportunity to respond to Plaintiffs' statements").

In the instant case, United Coal had the opportunity to address Xcoal's Rule 56.1 response in its briefing, and in fact took that opportunity. Doc. 90 at 15–30. While the Court will look to all arguments presented in the briefs, it will not separately consider United Coal's reply Rule 56.1 statement.

[2] This purchase order was signed on March 1, 2022 and the coal was delivered on March 5. Doc. 84 ¶¶ 211–12.

On March 21, 2022, Jason Popivchak, the director of logistics for Xcoal, emailed

Travis Hutton, United Coal's vice president of coal sales.  Doc. 78 ¶ 54.[3]  Popivchak

wrote:

> Travis:
>
> As discussed, I confirm the following coal purchase:
>
> April — 70K [metric tons] +/– 10% Wellmore at 93% Platts USEC HVA minus Xcoal Q2 rail rate
> May — 70K [metric tons] +/–10% Wellmore at 93% Platts USEC HVA minus Xcoal Q2 rail rate
> June — 60K [metric tons] Wellmore +/– 10% at 93% Platts USEC HVA minus Xcoal Q2 rail rate & 20K MT +/–  10% Affinity at 103% Platts USEC LV minus Xcoal Q2 rail rate.
>
> Pricing basis of Platts index average of 10 reporting days prior to vessel BL date.
>
> Payment terms — 15 days from BL date of vessel
>
> Coal will be sold to Xcoal FOB mine.  Once we receive our Q2 [Norfolk Southern Railroad] rail rate contract, we will finalize the  rail rate calculation.

*Id.* ¶ 54.[4]

Hutton responded to Popivchak's email:  "Thanks Jason, look's great.  Subject to

mutual agreement on pricing mechanism [net ton] mine work–back and confirmation that

[United Coal] won't be penalized by [Norfolk Southern Railroad] for [net ton] mine

shipments."  Doc. 78 ¶ 69.

In his deposition, Popivchak testified that he believed this email indicated that

pricing was "still a term . . . subject to mutual agreement."  Doc. 85-8 at 5; *see also* Doc.

---

[3] Earlier that day, in an email discussion about a potential United Coal purchase, Thrasher Jr. expressed hesitation due to the lack of a customer:  "I like the idea of being in the game, but we should be careful about buying supplies without sales . . . We have been sitting on Kellerman coal for quite some time during the hottest market ever.  Perhaps if we sold that, I would feel more comfortable buying another open position."  Doc. 78 ¶ 110.

[4] Popivchak's proposal allows for up to a 10% deviation in delivered tonnages.  Doc. 78 ¶ 54.  The same is true for the purchase orders discussed throughout this opinion.  *See id.* ¶¶ 17, 21–23, 31, 35.  Accordingly, even if not noted by the Court, all tonnage agreed to under either purchase order allows for a 10% deviation.

84 ¶ 222.  Meanwhile, in his deposition, Hutton acknowledged that there was not an agreement on the exact price, but that the agreement was still a "full-on deal" and that the rail rate was a "minor detail[]."  Doc. 85-9 at 9.

In Xcoal's March 21, 2022 "Ops Packet," a weekly document detailing Xcoal's upcoming shipments of coal, Xcoal listed, for the first time, 70,000 metric tons of Wellmore Coal to be shipped in each of April and May, 2022.  Doc. 78 ¶¶ 78–83.

In his deposition, Hutton indicated that, because of Popivchak's March 21, 2022 email, United Coal updated their April, May, and June shipping schedule; informed its coal mine operations to prepare for the shipments during that time period; and informed its parent company that it had reached a binding commitment to sell the coal.  *Id.* ¶ 84–86.  Further in his deposition, United Coal CEO John Schroder testified that, after Popivchak's email, United Coal ceased trying to sell the coal it had committed to Xcoal to other parties.  *Id.* ¶ 87.

On April 15, 2022, Xcoal sent initial signed versions of the purchase orders for Wellmore and Affinity Coal to United Coal, with the same coal quantities described in Popivchak's March 21, 2022 email.  Docs. 84 ¶¶ 50, 223.  On April 19, 2022, United Coal returned to Xcoal a revised version of the Wellmore Coal purchase order, which Hutton noted included, "a lot of our standard terms and conditions."  Doc. 87-18 at 2.[5] The parties exchanged further drafts of the Wellmore Coal purchase order on April 28, May 1, May 10, May 11, 2022, and June 9, 2022.  Doc. 84 ¶¶ 235, 239, 243, 245, 248.

---

[5] Among the edits in this updated version of the Wellmore Coal purchase order were the following:  adding an official "Term" to the agreement; revising the delivery schedule to be "tentative"; adding the provision that the parties "mutually agree in advance to modify the tentative delivery schedule"; revising the pricing provision by reducing the "Maximum of Freight" from $65 to $55 per net ton; adding a buyer default section; adding a limitation of liability section; adding a forum selection clause; adding representations and warranties; adding a confidentiality clause; and adding an indemnification clause.  Doc. 84 ¶¶ 230–31.

United Coal signed the final Wellmore Coal purchase order (the "Wellmore Purchase Order") on June 9, 2022, and Xcoal countersigned on June 13, 2022.  *Id.* ¶¶ 250–51.

On July 8, Xcoal sent a signed Affinity Coal purchase order (the "Affinity Purchase Order") with the same revisions present in the Wellmore Purchase Order.  *Id.* ¶ 252.  United Coal countersigned the Affinity Purchase Order later that day.  *Id.* ¶ 253.

### 3.  *The Wellmore and Affinity Coal Purchase Orders*

The Wellmore Purchase Order calls for United Coal to deliver, and Xcoal to accept, 200,000 metric tons of coal.  Doc. 78 ¶ 17.  Though the agreement was signed by Thrasher Sr. on June 13, 2022, the Wellmore Purchase Order has a "Date" of April 14, 2022[6]; a "Term" of "April 14, 2022 through June 30, 2022"; a "Delivery Period" of "April–June 2022"; and a "Tentative Delivery Schedule" calling for delivery and acceptance of 70,000 tons of Wellmore Coal in both April and May 2022 and 60,000 tons in June 2022.  Doc. 77-3 at 10–12.[7]

The Affinity Purchase Order calls for United Coal to deliver, and Xcoal to accept 20,000 metric tons of coal.  Doc. 78 ¶ 31.  Though the agreement was signed by Thrasher Jr. on July 8, 2022, the Affinity Purchase Order has a "Date" of April 14, 2022[8]; a "Term" of "June 1, 2022, through June 30, 2022"; a "Delivery Period" of "June 2022"; and a

---

[6] The Wellmore Purchase Order is dated April 14, 2022, on the first page as well as at the beginning of the terms and conditions.  Doc. 77-3 at 10, 13.

[7] The quantities of coal in the Wellmore Purchase Order match Popivchak's March 21, 2022 email.  Doc. 84 ¶ 50.

[8] Like the Wellmore Purchase Order, the Affinity Purchase Order is dated April 14, 2022, on the first page as well as at the beginning of the terms and conditions.  Doc. 77-5 at 2, 5.

"Tentative Delivery Schedule" calling for the delivery of 20,000 tons of Affinity Coal in June 2022.  Doc. 77-5 at 2–4.[9]

The Wellmore Purchase Order and the Affinity Purchase Order (together, the "Purchase Orders") have several identical provisions in their terms and conditions.

Section One of the terms and conditions is an integration clause which states,

The Purchase Order . . . and these Terms and Conditions of Purchase . . . represent the entire agreement between [Xcoal] and [United Coal] and together create a binding contract upon the terms and conditions herein set forth.  No change, modification, or revision to this Purchase Order shall be binding unless made in writing and signed by one of [Xcoal's] or [United Coal's] respective authorized representatives.

Docs. 77-3 at 14; 77-5 at 5.

Section Two states that, "[a]nything herein to the contrary notwithstanding, delivery of coal after the date of this Purchase Order constitutes acceptance of this Purchase Order and all of the terms and conditions hereof . . . ."  Docs. 77-3 at 13; 77-5 at 5.

Section Three outlines the delivery of coal explaining that:  risk of loss passes from United Coal to Xcoal once the coal is loaded at the "Delivery Point"; title of the coal passes from United Coal to Xcoal after United Coal receives full payment; Xcoal is responsible for obtaining train permits and scheduling trains from Norfolk Southern Railway; and United Coal is responsible for ordering rail cars from Norfolk Southern Railway to load the coal.  Docs. 77-3 at 13; 77-5 at 5.  The section states that failure to meet these requirements would subject the breaching party to liability, "subject to [the] limitation for liability under Section 11 . . ."  Doc. 78 ¶ 42.  Further, the section also

---

[9] As with the Wellmore Purchase Order, the quantities of coal described in the Affinity Purchase Order match Popivchak's March 21, 2022 email.  Doc. 84 ¶ 50.

contains a time-is-of-the-essence clause, which states "[r]egarding the delivery, time is of the essence hereof." Doc. 78 ¶ 41. The section concludes by noting, "[Xcoal] and [United Coal] will mutually agree in advance to modify the tentative delivery schedule set forth in this Purchase Order." Docs. 77-3 at 13; 77-5 at 5.

> Section Eleven, the "Limitation of Liability" section, states:
>
> (a) Neither party shall be liable to the other party whether in contract, tort (including without limitation negligence), breach of statutory duty, strict liability or otherwise and whether or not for defective performance or total failure to perform this Purchase Order, for:
>
>> (i) Loss of profits, anticipated profit, use, goodwill, business receipts, contracts or commercial opportunities, market reputation, power generation, cost of overheads thrown away or loss resulting from shutdown, reduced production or interruption at any plant of [Xcoal] or the [Xcoal's] buyer or end user, hedging costs; and/or
>>
>> (ii) Consequential, indirect or special damages of any nature whatsoever arising at any time and from any cause whatsoever.
>> . . .
>
> Doc. 84 ¶ 300.
>
> Section Seventeen defines the "Sellers Obligations" as:
>
> (i) [United Coal's] obligations with regard to the quality of the coal supplied are limited solely to supplying coal which correspond to the condition, quality, description and specifications set out in this purchase order.
>
> (ii) Other than what's set out in this Purchase Order, [United Coal] gives no guarantees, conditions warrantees, or representations . . . in relation to the quality, satisfactory quality, merchantability, fitness or suitability of the coal . . .
>
> (iii) Without prejudice to the foregoing, no terms of any nature whatsoever, whether of an intrinsic or extrinsic nature to this Purchase Order or otherwise, shall be implied into this Purchase Order be they based on usage, custom, course of dealing, business efficacy or otherwise.

Docs. 77-3 at 18; 77-5 at 10.

### 4. *Performance Under the Purchase Orders*

Prior to signing the Purchase Orders, Xcoal did not schedule shipments of either Wellmore or Affinity Coal.[10]  Doc. 84 ¶¶ 262–65, 268.  Xcoal contends that it did not schedule shipments during the months of April, May, and June of 2022, because the Wellmore Purchase Order had yet to be finalized and because United Coal refused to ship coal until the purchase order was finalized.[11]

United Coal contests that it refused to ship coal prior to a finalized purchase order.[12]  Further, United Coal contends that Xcoal's refusal to schedule shipments of coal during these months[13] was solely due to its inability to secure a commitment from a third-party customer.[14]  Throughout the negotiations, no Xcoal representative ever explicitly

---

[10] However, on May 14, 2022, Xcoal did apply for train loading permits, a necessary precursor to accepting coal from United Coal.  Doc. 78 ¶ 161.

[11] *See* Doc. 87-5 at 2 (May 1, 2022 email from Hutton to Xcoal stating, "[p]lease find attached any comments/changes back on [the] contract.  I believe we are very close and need to get this signed so that we can ship."); Doc. 87-6 at 2 (May 11, 2022 email from Hutton to Xcoal stating, "[p]lease find attached the latest mark-up.  We are very close and hopefully the attached works.  Please let me know asap, because we need to schedule these trains.").

[12] *See* Doc. 76-16 at 2–12 (several dozen texts beginning on April 11, 2022 that Hutton sent Popivchak, repeatedly asking for updates on the status of any upcoming train shipments of coal and of finalizing the purchase order, seemingly independently); Doc 91 ¶ 337 (April 26, 2022 email from United Coal's CEO, John Schroder, to Xcoal's Thrasher Sr., which begins, "I wanted to reach out to you on the status of UCC getting cars for the loading of this first vessel, as this is starting to put us in a bind. . . . We planned this first vessel into our shipments and to this date there isn't any movement."); Doc. 78 ¶ 123 (May 7, 2022 email from Hutton to Xcoal "[w]e committed to this deal on March 21 and have depended on this tonnage to happen in April through June.").

[13] In its responsive Rule 56.1 statement, Xcoal admits that for the month of April 2022, it did not arrange shipments of any coal because it did not have a firm commitment from a third-party customer.  Doc. 84 ¶ 117.  It does not make the same representation for the other months at issue.

[14] *See* Doc. 78 ¶¶125–26 (showing that in his deposition, Thrasher Sr. testified that he spoke with Hutton around May 7, 2022, and told Hutton that Xcoal was having problems securing a commitment from their third-party customer); *see* Doc. 76-1 at 53 (showing that Thrasher Sr. also testified that through July 20, 2022, the reason that Xcoal had not scheduled the expected shipments of coal from United Coal was a lack of commitment from a third-party customer); Doc. 78 ¶¶ 148–51 (showing that Xcoal initiated arbitration against a third-party customer for that third-party's failure to accept coal that Xcoal agreed to purchase from United Coal).  In support of this argument, United Coal argues that Xcoal's nonperformance was not due to the fact that the Purchase Orders were not signed.  *See* Doc. 76-21 at 10 (showing that Xcoal internally tracks unsigned contracts with their first shipment date); Doc. 78. ¶ 155 (detailing that Xcoal has,

stated that Xcoal would not schedule coal shipments prior to signing the finalized Purchase Order. Doc. 78 ¶¶ 120–21, 128–31.

On June 20 2022, a week after the signing of the Wellmore Purchase Order, Xcoal accepted and paid for 53,420 metric tons of Wellmore Coal. Docs. 78 ¶¶ 90–91; 84 ¶ 265. Also in June 2022, Xcoal accepted delivery of, but did not pay for, approximately 6,800 metric tons of Wellmore Coal. Doc. 78 ¶¶ 92–93. Xcoal ultimately paid for those 6,800 metric tons of Wellmore Coal one year later, in June 2023, when the coal was transferred from railcars at the port and loaded onto a vessel. Doc. 78 ¶¶ 94–95.

---

in the past, shipped coal without signed agreements); *id.* ¶¶ 176–181 (showing that an internal Xcoal memoranda sent on August 3, 2022 detailed a contractual commitment for 200,000 metric tons of Wellmore Coal in April–June, 2022).

In his deposition, Thrasher testified regarding Xcoal's third-party customer, ADI:

> Q. And as you had this discussion with Mr. Hutton following this email of July 20, 2022, is it true that the reason Xcoal hadn't shipped any additional coal from Wellmore was ADI's lack of performance, vis-a-vis your relationship with ADI? . . .
> [A]. I think the reason was they were still getting coal from Metinvest, and they didn't need to perform on our contract. So ADI was intentionally delaying the negotiation of our contract in order to accept the vessels directly from Metinvest.
> Q. That's ADI's reason -- or that explains why ADI wasn't purchasing coal from Xcoal in this time period?
> A. Correct.
> Q. Does that also explain why Xcoal wasn't accepting deliveries from Wellmore [Coal] during this time period?
> A. It's a reason we weren't.
> Q. Are there other reasons?
> A. We were -- we were continually looking for people to take the tons . . .
> Q. And -- so then a reason was ADI's lack of performance vis-a-vis Xcoal. Another reason would be you were unable to find a customer away from ADI to accept the coal; correct?
> A. During this time period, yes.
> Q. Is there any other reason that Xcoal wasn't accepting deliveries from United Coal Company?
> A. No. I should just clarify that. Xcoal couldn't schedule deliveries because we could only schedule deliveries when we had a vessel to dump the coal on. So accepting a delivery is -- it's required to schedule it and have a vessel first. If we could have accepted one, we would have. . . . But we couldn't because we didn't have a vessel to dump the coal at the port.
> Q. And you didn't have a vessel because you didn't have a customer to send the vessel to; correct?
> A. Correct. . . .

Doc. 76-1 at 51–53.

On July 14, 2022, almost a week after signing the Affinity Purchase Order, Xcoal accepted delivery of and paid for 2,630 metric tons of Affinity Coal. Docs. 78 ¶¶ 99, 101; 84 ¶ 268.

In Thrasher Sr.'s deposition, he testified that as of July 20, 2022, Xcoal had not accepted any additional deliveries of coal because it did not have third-party customers. Docs. 78 ¶ 136–138. On July 21, 2022, Hutton emailed Thrasher Sr.:

> As you know, we entered into an agreement on [March][15] 21, 2022 for an order of 220,000 MTs of coal with a schedule of the following.
>
> | Wellmore: | April 2022: 70,000 MT(+/– 10%) |
> |---|---|
> | | May 2022: 70,000 MT(+/– 10%) |
> | | June 2022: 60,000 MT(+/– 10%) |
> | Affinity: | June 2022: 20,000 MT(+/– 10%) |
>
> [W]e have only shipped approximately 54K of the total contracted volume of 220K MT. We have for months (almost daily) asked for times to schedule trains with very little feedback. However, [United Coal] honored our contractual obligations and kept the required inventory of coal allocated to Xcoal. As a result of these shipping delays our inventories have substantially increased causing considerable financial damages. Nevertheless, to preserve our good relationship, we are currently refraining from issuing a formal default notice to Xcoal and would like to resolve this issue amicably. Firstly, we need to modify the initial delivery schedule and truly commit to it. . . . Look forward to receiving a reasonable plan of action from Xcoal this week to get caught up on tonnage over the next 30–45 days.

*Id.* ¶ 139. Thrasher Sr. did not respond to the email. *Id.* at ¶ 140. Between July 25 and August 3, 2022, Hutton texted Popivchak several times asking for an update on the email that he sent Thrasher Sr. Doc. 76-16 at 22–23.

On August 11, 2022, United Coal notified Xcoal that it was in default of its obligations to accept delivery of and timely pay for coal under both Purchase Orders.

---

[15] The original email details April 21, 2022; though in his deposition, Hutton indicated that this was a mistake and that it should read March 21, 2022. Doc. 78 ¶ 139.

Doc. 78 ¶ 143.  On August 15, 2022, Xcoal sent a letter to United Coal, stating that the parties had been in regular contact about "the problems which Xcoal has encountered with its customer for the Wellmore Coal" and that Xcoal "values its long-standing relationship with United Coal and would like to . . . meet and discuss in good faith a mutually beneficial resolution of the matter."  Doc. 77-20 at 4.

On October 20, 2022, Popivchak emailed Hutton, stating that Xcoal wanted to load 33,000 tons of Wellmore Coal and 11,000 tons of Affinity Coal onto a vessel in November 2022.  Doc. 84 ¶ 277.  On October 25, 2022, Hutton texted Popivchak, "a few weeks ago your legal counsel told ours that Xcoal would be making a proposal to cure Xcoal's default of our agreement.  Our counsel never heard back.  So, at least for now, we cannot accept orders from Xcoal."  Doc. 87-42 at 2.

On November 1, 2022, Xcoal's general counsel emailed United Coal, confirming that United Coal was unwilling to accept Xcoal's October 20, 2022 request.  Doc. 84 ¶ 279.  On November 20, 2022, United Coal's external counsel responded in part, "[a]s is made clear in this correspondence Xcoal (a) failed to perform its obligations under these Purchase Orders, (b) was given an opportunity to cure its default under the Purchase Orders, (c) failed to cure and (d) is in breach of these Purchase Orders.  Accordingly, Xcoal has no contractual rights to purchase any coal from United Coal."  Doc. 85-3 at 3.

On November 23, 2022, Xcoal again attempted schedule delivery of Wellmore and Affinity Coal pursuant to the Purchase Orders.  Doc. 84 ¶ 281.  On December 4, 2022, United Coal's external counsel emailed Xcoal's general counsel, in part stating "United [Coal] has made its position clear in the correspondence:  Xcoal has defaulted and breached the purchase orders and has no rights with respect to those purchase orders.

11

While United [Coal] prepares its lawsuit to enforce its rights under those purchase orders, United [Coal] remains open to a proposal from Xcoal as to how to resolve this situation." Doc. 85-4 at 2.

At the time of the briefing, Xcoal had accepted delivery of and paid for approximately 61,000 metric tons of Wellmore coal pursuant to the Wellmore Purchase Order, [16] and approximately 2,630 metric tons of Affinity coal pursuant to the Affinity Purchase Order. Doc. 78 ¶¶ 97, 102.

5. *United Coal's Damage Theory and Expert Emily Medine*
a. *United Coal's Damage Theory*

In a letter dated April 20, 2023, three months before the complaint in this case was filed, United Coal sent a Rule 408 settlement communication letter to Xcoal concerning its damages calculation. Doc. 104-3. In that letter, United Coal explained:

> United Coal basically took the contract prices, which are based on indexes . . . then multiplied that average figure by the short tons[,] and, finally, . . . subtracted out what it ultimately received for the coal on the open market. . . . That means United Coal received $21 million for coal Xcoal was contractually obligated to buy for $48 million, resulting in damages of $27 million. And that's just on the [Wellmore Purchase Order].
>
> For the [Affinity Purchase Order], Xcoal was supposed to take 20,000 tons in June. Based on the indexes . . . Xcoal should have paid a total of $6 million. United Coal was again able to sell that coal to other buyers . . . United Coal received about $3.8 million for coal Xcoal was contractually obligated to buy for $6 million, resulting in damages of $2.2 million.
>
> These quick calculations show almost $30 million in damages across the two contracts. And they are by no means the most aggressive damages calculations possible. We remain very interested in an amicable solution here.

---

[16] This amount is slightly larger than the total amount of Wellmore Coal that results from adding the amounts from Xcoal's June 2022 orders of Wellmore Coal, which totals 60,200. 78 ¶ 91–92. However, the parties agree to the 61,000 figure. Doc. 78 ¶ 97.

*Id*.

In its Rule 26(a)(1) initial disclosures, served on September 12, 2023, United Coal calculated the amount of revenue it expected from Xcoal under the Purchase Orders, the amount of revenue it received from Xcoal, and the amount of revenue it received from subsequent sales of Wellmore and Affinity Coal. Doc. 84 ¶ 312. In those disclosures, United Coal explicitly provided two different estimates for damages under each of the Purchase Orders: unmitigated losses under the Purchase Orders if United Coal is a lost volume seller[17] and resale damages if United Coal is not. Doc. 87-53 at 6; *see* Doc. 84 ¶ 312.

> With respect to the Wellmore Purchase Order, United Coal argues:
>
> [I]f United Coal is not a lost volume seller under UCC § 2-708, United Coal received $21 million for coal Xcoal was contractually obligated to buy for $48 million, resulting in damages of $27 million. United Coal reserves the right to claim it is a lost volume seller under U.C.C. § 2-708. In that case, damages would be $48,000,000 in lost revenue minus the cost to produce 150,00 tons [of Wellmore Coal].

---

[17] "A lost volume seller is one who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity." *In re WorldCom, Inc.,* 361 B.R. 675, 685 (Bankr. S.D.N.Y. 2007) (citation omitted). Lost volume sellers are not adequately recompensed by market or resale damages, and therefore they traditionally seek damages under N.Y.U.C.C. § 2-708(2). *See Trans World Metals, Inc. v. Southwire Co.,* 769 F.2d 902, 907 (2d Cir. 1985) ("The drafters of the Uniform Commercial Code recognized that [N.Y.U.C.C. § 2-708(1)] would not adequately compensate certain types of sellers, generally referred to as 'lost volume sellers.' Therefore, an alternative measure of damages was provided for those sellers who would be *inadequately* compensated by the standard contract/market price differential: [N.Y.U.C.C. § 2-708(2)].").

N.Y.U.C.C. § 2-708(2) provides:

> (2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this Article . . . , due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

N.Y. U.C.C. Law § 2-708 (McKinney).

13

Doc. 87-53 at 6.  Similarly, with respect to the Affinity Purchase Order, United Coal

argues:

> [I]f United Coal is not a lost volume seller under U.C.C. § 2-708, United Coal
> received about $3.8 million for coal Xcoal was contractually obligated to buy for
> $6 million, resulting in damages of $2.2 million.  United Coal reserves the right to
> claim that it is a lost volume seller under U.C.C. § 2-708.  In that case, its
> damages would be $6,000,000 in lost revenue minus the cost to produce 20,000
> tons [of Affinity Coal].

*Id*.  United Coal further reserved the right to claim it was a lost volume seller under both

Purchase Orders at a later date and indicated that it was continuing to calculate cost

figures and reserved the right to identify damages with more specificity with the aid of an

expert.  Doc. 84 ¶ 312.

Two months later, in its November 13, 2023 response to Xcoal's interrogatory

concerning "all damages" sought in the case, United Coal wrote:

> **Response:** . . . [A]s described in United Coal's April 20, 2023 letter . . . , United
> Coal estimates that it suffered approximately $48 million in lost revenue on the
> [Wellmore Purchase Order], and approximately $6 million on the [Affinity
> Purchase Order].  United Coal determined these numbers by taking the contract
> prices, which are based on indexes, and then averaging out a low, middle, and
> high option (because the precise timing was somewhat uncertain) and then
> multiplying that average figure by the short tons.  As mentioned in the letter, these
> are simply quick calculations and by no means represent that most aggressive
> damages calculation possible.
>
> Also note that, under New York law, United Coal is a lost volume seller "who has
> the capacity to perform the contract that was breached in addition to other
> potential contracts due to unlimited resources or production capacity.  A lost
> volume seller does not minimize its damages by entering into another contract
> because it would have had the benefit of both contracts even if the first were not
> breached." *In re WorldCom, Inc.*, 361 B.R. 675, 685 (Bankr. S.D.N.Y. 2007).  As
> a lost volume seller, United Coal has no duty to mitigate damages for breach of
> contract or to otherwise cover.  *See id*.
>
> United Coal will supplement this response as more information becomes available
> and as it obtains expert determinations of the damages calculation.

Doc. 84 ¶ 314.  United Coal did not supplement this answer.  Doc. 84 ¶ 315.

14

On April 15, 2024, United Coal responded to another interrogatory, which asked about United Coal's efforts to mitigate losses.  Doc. 104-4.  United Coal responded:

> **Response:**  First, United Coal states that its answer to this interrogatory should in no way be considered a waiver of its argument that it is a lost volume seller. United Coal maintains that, under New York law, it is a lost volume seller "who has the capacity to perform the contract that was breached in addition to other potential contracts due to unlimited resources or production capacity.  A lost volume seller does not minimize its damages by entering into another contract because it would have had the benefit of both contracts even if the first were not breached." *In re WorldCom, Inc.*, 361 B.R. 675, 685 (Bankr. S.D.N.Y. 20007).  As a lost volume seller, United Coal has no duty to mitigate damages for breach of contract or to otherwise cover.  *See id*.  Therefore, Xcoal's interrogatory related to mitigation and/or cover is irrelevant.  United Coal makes this objection to preserve its argument, but, subject to that objection, responds as follows:
>
> United Coal made the following spot sales to the listed customers in the amounts and prices in the chart below after Xcoal's breaches of contract. . . .

*Id.*  When Xcoal requested the underlying data related to these resales, United Coal provided the data sources.  *See* Doc. 104 at 6–8.

On January 31, 2025, Xcoal sent United Coal a revised Rule 30(b)(6) notice, which sought an organizational representative who could speak to:  "United Coal's alleged damages in this case"; "United Coal's sale of Wellmore and Affinity Coal in 2022"; and "United Coal's efforts to mitigate its damages due to any alleged breaches of the Wellmore or Affinity Purchase Orders by Xcoal."  Doc. 104-5 at 6.

In his February 6, 2025, deposition as the designated corporate representative on the topic of damages, Paul Gregory, the chief financial officer of United Coal, identified three types of damages that United Coal sought:  (1) lost market opportunities; (2) increased inventory costs; and (3) reputational damages.  Doc. 84 ¶¶ 316–17.[18]  Gregroy

---

[18] In its brief in support of its motion, United Coal indicates that it is not pursuing either increased inventory costs or reputational damages.  Doc. 90 at 51, n.7.

testified that, after Xcoal's alleged breach, United Coal resold the coal to third-parties for a lower price than the Purchase Orders called for. Doc. 87-14 at 7 ("So one of the damages was the fact that we missed out on a great market, and that is the tons that we were going to sell to Xcoal at a high price, we ended up having to sell at a much lower price as a result of the market tanking during the period while Xcoal was being inactive . . .").[19] As Xcoal questioned Gregory about how lost market opportunities should be calculated, counsel for United Coal, Nicholas Johnson, interrupted and stated that, "if [United Coal] were to present damages at trial, we would rely on Ms. Medine and the information in her reports." Doc. 84 ¶ 319.[20]

In a second Rule 30(b)(6) deposition conducted on February 7, 2025, corporate representative Hutton was also questioned about United Coal's efforts to sell Wellmore and Affinity Coal initially reserved for Xcoal:

> Q:       All right. [S]o you've calculated those shortfall tons, the tons that you believe, "you" being United Coal believes that Xcoal should have taken under Wellmore and Affinity [Purchase Orders]; right?

---

[19] In their responsive Rule 56.1 statement, United Coal admits that Gregory testified that lost market opportunities would be calculated "in the form of lost profits as identified in Ms. Medine's expert reports." Doc. 91 ¶ 317.

[20]  Gregory acknowledged that he and Medine may calculate damages differently:

> Q: . . . You're aware that there's been an expert retained by United Coal, Emily Medine . . .  to provide expert opinions in this case?
> A: Yes.
> Q: And in particular, she [has] provided opinions regarding damages?
> A: Yes.
> Q: Okay.  And are -- the missed out on the great market category of damages, is that what you understand she provided opinions about?
> A: Yes.
> Q: Okay.  Do you have any additional information about -- that she didn't provide in her reports?
> A: I believe that her report captured the essence of the -- of the timing impact, the damages associated with losing out on the good market.
> Q: Okay.  So, if I want to know how to quantify that, I should look at her reports?
> A: She's an expert from a legal standpoint of how to calculate damages.  Her methodology may differ a little bit from my finance type.  But it would be very close.

Doc. 87-14 at 8.  However, as noted above, later in the deposition, counsel for United Coal indicated that United Coal would rely on Medine for any damages calculations at trial. Docs. 84 ¶ 319; 87-14 at 8.

16

A: Mm-hmm.

Q: And that [] 139,530 tons [that] were . . . no longer were reserved  for delivery to Xcoal . . . were resold to . . . .  five customers . . . . ?

A: Yeah.

          . . .

Q: And [] what's being shown here is . . . the price realized and the difference in the prices that would have been realized under Wellmore [Purchase Order] and [that] were ultimately realized from these [third-party] customers are United Coal's damages,  right?

A: Yes.

Q: . . . [W]hen you say "subsequent spot sales," that's really the resale of that tonnage, right?

A: Right.

Q: And then on the next page, same thing for [the] Affinity [Purchase Order] . . .

A: Mm-hmm.

Q: . . . And that difference [between the] Affinity [Purchase Order] price and the resale price is the damages expressed in this sheet?

A: That is correct.

Doc. 104-7 at 5–7.

### b. Emily Medine

Emily Medine is United Coal's expert witness on damages.  Doc. 84 ¶ 303. Medine produced an expert report providing initial damages calculations, Doc. 85-46; a rebuttal report responding to Xcoal's expert, Fran Taglia, Doc. 85-48; and three supplements to her initial report.  Docs. 85-49, 85-50, 85-51.[21]

During her January 17, 2025 deposition, Medine stated that in her initial expert report, she calculated United Coal's lost profit damages, confirmed that she did not think

---

[21] Medine additionally produced a "Supplemental Expert Report," not related to her damages calculation. Doc. 85-47.

that resale[22] or market[23] damages were applicable, but also testified about the data underlying resale revenue calculations in her initial report.[24]  When asked, Medine stated she did not provide calculations on resale or market damages, testifying:

Q:      Are you providing a damage calculation under the Wellmore purchase order based on the difference between contract and market?

                    . . .

A:      I'm just trying to -- what's my alternative -- . . . what's the alternative to that?  I'm just trying to figure out what you're saying.  The answer is, I'm providing damages based upon the lost revenue minus the production costs.

Q:      Right.  So you're not providing -- I'll ask a large question, and we can break it down however you see fit.

A:      Okay.

Q:      There are a couple of different ways to determine damages, right?

A:      Sure.

Q:      And you're an expert in the coal industry and you've done many coal supply agreements.  You know that sometimes they're determined as they call cover or market damages, right?

A:      Right.

Q:      One is the difference between contract price and resale price, right, or contract price and cover price, right?  That's one?

A:      (No verbal response)

Q:      And another way to do that is if you don't, you know, resell the coal, it can be contract versus prevailing market price, right?

A:       Yeah, but neither of those are particularly applicable in this setting.

Q:      . . . [W]hether they're applicable or not, you're not offering an opinion on any damages based on the difference between contract and market or contract versus resale, right?

---

[22] Under N.Y.U.C.C. § 2-706, a seller of goods may be able to recover the difference between the contract price and the resale price after a buyer's breach.  N.Y.U.C.C. § 2-706(1) provides:

> (1) Under the conditions stated in Section 2-703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article . . . , but less expenses saved in consequence of the buyer's breach.

[23]  Under the N.Y.U.C.C. § 2-708(1), a seller of goods may be able to recover the difference between the contract price and the market price at the time of a buyer's breach.  N.Y.U.C.C. § 2-708(1) provides:

> (1) Subject to subsection (2) . . . , the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article . . . , but less expenses saved in consequence of the buyer's breach.

[24] Medine's deposition occurred before she submitted her final two supplemental reports.

18

> A:    Correct.

Doc. 103-1 at 6.[25]  However, later in that deposition, when questioned about data underlying her resale revenue calculations, Medine testified:

> Q:    And the prices United Coal realized on replacement sales. Okay?  Do you see that?
> A:    Uh-huh.
> Q:    Where is that data disclosed?
> A:    Well, it's in the report itself. . .
>
>            . . .
>
> Q:    So you relied on replacement sales, the pricing under replacement sales to help calculate your lost volume damages, right?
> A:    No.
> Q:    No?
> A:    No, not particularly because it was a different time period.  It did not offset the damages for the time period.  This was subsequent to it.
> Q:    Where can I see the data regarding replacement sales?
> A:    We'll get that to you.

*Id.* at 9.  Further, Medine confirmed that her initial report calculates United Coal's lost profit damages under both Purchase Orders,

> Q:    . . . I'm going to describe this very basic.  You can disagree, but I really understand there's things that go into the calculation of the base price.  Under [the] Wellmore [Purchase Order] you took the tonnage not delivered, right?
> A:    Uh-huh.
> Q:    Multiplied it by the base price, right?
> A:    (No verbal response).
> Q:    And then you subtracted from that base price the costs that went into production of that tonnage.  Is that a fair overview?
> A:    That's a fair statement.
> Q:    And under the Affinity [Purchase Order], you again, took the tonnage not delivered under the Affinity contract, right?
> A:    Uh-huh.
> Q:    You multiplied it by the base price under the Affinity [Purchase Order], right?

---

[25] Later in that same deposition, Medine testified:

> Q: You never looked at the Affinity purchase order or the Wellmore purchase order to determine whether or not United Coal was entitled to lost profits, did you?
> A: I'm calculating the lost profits, so that's the question.  I mean, I think they were entitled to it . . .

Doc. 103-1 at 11.

> A:    Uh-huh.
> Q:    And then you subtracted the costs incurred to produce those tons?
> A:    Uh-huh.
> Q:    Is that, what you've just described, lost volume, is that essentially the lost profits?
> A:    It's essentially the lost profits.

*Id.* at 10.

In the "Summary of Opinions" section in her initial report, Medine estimates that "United Coal lost more than $50 million in revenue pursuant to the [Purchase Orders]." 85-46 at 7. She continues, "[a]djusting for the cost of production, I estimate that United Coal lost over $28 million in earnings . . . ." Doc. 85-46 at 8. In determining this figure, Medine looked to the total amount of undelivered coal, the corresponding revenue that United Coal would have received for the undelivered coal, and United Coal's expected "costs of produc[ing]" the undelivered coal. Doc. 85-46 at 7–8.[26] Finally, Medine notes that "[w]hile some of the revenues were offset with subsequent sales, there is no indication that such sales would not have occurred had Xcoal accepted deliveries of all contract volumes. In other words, United Coal could have made both sales, meaning the later sales [d]o not offset the missed tonnage." *Id.* In the "Damages" section of her initial report, in addition to calculating lost earnings, Medine also calculates the revenue generated through United Coal's sales of Wellmore and Affinity coal to third parties after Xcoal's alleged breach. Doc. 85-46 at 13–14 (stating that subsequent sales of Wellmore Coal generated $24.1 million of revenue and that subsequent sales of Affinity Coal

---

[26] Medine additionally provides an estimate of $6 million in interest on the "lost earnings." Doc. 85-46 at 8.

generated $4.4 million of revenue).  However, next to those calculations, she notes that United Coal did not have a duty to mitigate its losses using these sales.[27]  *Id.*

Medine's subsequent reports provide additional support and adjustments for her lost earnings calculations.  Medine's first supplement to her expert report merely identifies the underlying documents she utilized in her initial report's calculations.  Doc. 85-49.[28]  Medine's second supplement corrects and clarifies her damage calculation charts, including a "Revised Damage Calculation" in which damages are calculated by multiplying the expected margin per ton of undelivered coal by the undelivered tons.  Doc. 85-50 at 4.

Medine's third supplement updates her damage calculations to account for Xcoal's July 2022 purchase of 2,899.45 tons of Affinity Coal, which she did not previously know about.[29]  Doc. 85-51.  Again her "Revised Damage Calculations" multiply the expected margin per ton of undelivered coal by the updated undelivered tonnage.  *Id.* at 4.  In this third supplement, in addition to updating her lost earnings calculations, Medine calculates the revenue generated from subsequent sales of the Wellmore and Affinity Coal.  *See id.* at 5.  Medine estimates that the "lost margin" between the expected revenue under Wellmore Purchase Order and the revenue generated

---

[27] With respect to the subsequently sold Wellmore Coal, Medine notes, "there is no indication that these sales could not have occurred if Xcoal had performed."  Doc. 87-46 at 14.  Similarly, with respect to the subsequently sold Affinity Coal, Medine notes that, "United Coal was able to mitigate some of the . . . losses under the [Affinity Purchase Order].  However, the price for the replacement sales was significantly below the price United Coal would have realized under the [Affinity Purchase Order]."  *Id.*

[28] Medine asserts that her initial report adequately identified all documents she relied upon; however as Xcoal's counsel indicated that her initial report was deficient in this regard, she supplied this first supplemental report.  Doc. 85-49.

[29] Medine states that this sale was not present in her initial calculations as she was unaware of this payment prior to the deposition of Xcoal Vice President of Coal Sales, Travis Hutton.  Doc. 85-51 at 3; *see* Doc. 84 at 301.

through subsequent sales of Wellmore Coal was $22 million. *Id.* The estimated "incremental profits" between the revenue under the Affinity Purchase Order and the revenue generated from the subsequent sale of Affinity Coal was "about $1.5 million." *Id.* Medine explained her inclusion of this calculation by noting, "Xcoal continues to believe that some of these losses should have been offset by United Coal's subsequent sales of Wellmore and Affinity coals to other parties," and stating that to calculate this version of damages, she "assume[s] the premise of Xcoal's position." *Id.* [30]

Finally, Medine's rebuttal report responds to the report of Xcoal's expert Taglia's by: providing context about the coal industry practice; highlighting that Taglia's report "did no analysis related to whether United Coal was or was not a lost volume seller;" critiquing Taglia's damage calculations; and responding to Taglia's critique of her damage calculations. *See* Doc. 85-48 at 7.

### 6. *Expert Fran Taglia*

Fran Taglia is Xcoal's expert witness. Doc. 77-25 at 7. Taglia produced three expert reports: an initial expert report, Doc. 77-25, a rebuttal report, Doc. 77-26, and a

---

[30] With respect to the Wellmore Coal agreement, Medine notes:

> In the table below, I assume the premise of Xcoal's position and calculated the damages by (1) considering the new payment testimony . . . and (2) offsetting that amount by subsequent payments made to third parties. . . . While these sales yielded revenues in excess of $24 million, they in no way offset the profits incurred by United Coal due to Xcoal's failure to perform during the contract term. I estimate that the lost margin was about $22 million simply due to the change in pricing during these two periods.

Doc. 85-51 at 5. With respect to the Affinity Purchase Order, Medine notes:

> Similarly, accepting Xcoal's premise and in light of new payment testimony, the sales of Affinity Coal were at prices below the June 2022 pricing in the sales agreements. Under the sales agreement, the price for Affinity coal would be approximately $277 per ton . . . . Under the subsequent sales made, the equivalent Affinity price was closer to $200 per ton. The incremental profits to United Coal would have been about $1.5 million.

*Id.*

supplemental report, Doc. 85-55. Taglia's initial expert report provides background on the coal industry and the parties, an analysis of the Purchase Orders and their terms, his opinions concerning United Coal's alleged breach of the Purchase Orders, and Xcoal's damages calculation, *see* Doc. 77-25; his rebuttal report responds to the opinions of Medine's initial report, *see* Doc. 77-26; and his supplemental report provides a response to one of Medine's supplemental reports concerning damages, *see* Doc. 85-55.

During his deposition, in response to questions from United Coal, Taglia provided his interpretation of the Purchase Orders and the obligations resulting from them. *See e.g.*, Doc. 77-7 at 4 (Taglia believed that both Xcoal and United Coal were merchants under the U.C.C.); *id* at 7–8 (Taglia believed that Popivchak's March 21, 2022 email was insufficient to create a contract between Xcoal and United Coal); *id.* at 9 (Taglia believed that the Purchase Orders became effective upon both parties agreeing to all terms).

### B. Procedural Background

United Coal filed this action on July 3, 2023, alleging that Xcoal breached the Purchase Orders. Doc. 1. On August 22, 2023, Xcoal filed an answer with counterclaims, which Xcoal amended on October 28, 2024. Docs. 7, 64. In the amended answer, Xcoal asserts eleven affirmative defenses and two counterclaims against United Coal, alleging that United Coal breached the Purchase Orders. Doc. 64 at 13–14, 25–28. United Coal filed an answer to the counterclaims on November 12, 2024. Doc. 65. The parties engaged in discovery, which ended on February 19, 2025. *See* Doc. 68.

United Coal filed a motion for partial summary judgment and to partially strike Taglia's expert testimony on April 7, 2025. Doc. 74. United Coal argues that the Court should grant summary judgment in its favor on the issue of liability on the breach of

contract claims, Xcoal's counterclaims, and a majority of Xcoal's affirmative defenses.[31] Doc. 75 at 8.  United Coal also seeks to strike portions of expert Taglia's testimony, which it argues are legal conclusions and irrelevant.  Doc. 75 at 40–46.

On May 5, 2025, Xcoal filed a cross-motion for summary judgment and to partially strike Medine's expert testimony.  Docs. 82, 83.  Xcoal moves to strike portions of expert Medine's testimony because her opinions allegedly relate only to lost profit damages, which are foreclosed by the Purchase Orders.  Doc. 83 at 22.  Xcoal also moves for summary judgment on United Coal's two breach of contract claims, arguing that the damages that United Coal seeks, i.e., lost profit damages, are contractually prohibited.  *Id.* On March 23, 2026, the parties appeared before the Court for oral argument.[32]

## II.    LEGAL STANDARD

### A.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free School District.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the

---

[31] United Coal is not seeking summary judgment on damages.  Doc. 75 at 8.

[32]  At oral argument, the Court asked the parties to file a follow up letter concerning Medine's deposition testimony.  On March 24, 2026, Xcoal filed a letter concerning Medine's deposition, and United Coal filed a letter concerning Medine's deposition and more generally United Coal's theory of damages.  Docs. 103, 104.  In a second letter filed on March 23, 2026, Xcoal argued that United Coal's letter constituted additional briefing and impermissibly included new discovery documents not included in the initial briefing.  *See* Doc. 105.  However, in the interest of having a full record before deciding on summary judgment, the Court will consider United Coal's additional submissions.

governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center.*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'" *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture, or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester County*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and

25

in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted).  The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment.  *Morales*, 249 F.3d at 121.

### B.  Motion to Strike Expert Testimony

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  Pursuant to the Rule:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . . : (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  To be admissible under Rule 702, expert testimony must "both rest[ ] on a reliable foundation and [be] relevant to the task at hand."  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  The party offering the testimony has the burden of establishing its admissibility by a preponderance of the evidence.  *See American Empire Surplus Lines Ins. Co. v. J.R. Contracting & Environmental Consulting, Inc.*, 743 F. Supp. 3d 530, 536 (S.D.N.Y. 2024).

### III.    DISCUSSION

### A.  Motion to Strike Xcoal's Expert, Fran Taglia

United Coal argues that the Court should prohibit Taglia from offering opinions at trial concerning his interpretation of the Purchase Orders and the resultant obligations on Xcoal and United Coal, as they are legal opinions.  Doc. 75 at 40–46.  United Coal takes issue with several opinions which Taglia shared in his expert reports and his deposition,

which included:  the legal effect and meaning of the "tentative" delivery schedule in the Purchase Orders; the date that the Purchase Orders became effective; the contractual rights established by the Purchase Orders; and which party ultimately breached the Purchase Orders.  *Id.*

In the Second Circuit, "[a]s a general rule, an expert's testimony on issues of law is inadmissible."  *U.S. v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir. 1991); *see PharmacyChecker.com v. National Association of Boards of Pharmacy,* No. 19 Civ. 7577, 2023 WL 2973038, at *15 (S.D.N.Y. Mar. 28, 2023) ("[W]hile an opinion is not objectionable just because it embraces an ultimate issue, the Second Circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.") (internal quotations removed).

Xcoal does not deny that Taglia offered legal opinions in his expert reports or his deposition but instead states that it will not offer Taglia's opinions as to the meaning of terms or legal effect of the parties' conduct.  Doc. 83 at 70–73.  Xcoal plans to offer Taglia's expert opinion to establish:  background on the coal industry including the relationship between producers and brokers, the scheduling and performance of coal supply contracts, and the coal market in the years at issue; the parties' course of conduct in relation to industry standards; the amount of damages suffered by Xcoal due to United Coal's alleged breach; and critiques of Medine's opinions on damage calculations.  *Id.* at 70–71.  In United Coal's reply brief, it takes no issue with Xcoal's response.  Doc. 90 at 29 ("Xcoal also concedes United Coal's motion related to its expert.  It acknowledges that it cannot offer legal opinions or interpretations of the contracts at issue here.  United Coal accepts this concession.").

27

Accordingly, United Coal's motion to strike Taglia is GRANTED insofar as Taglia is prohibited from offering interpretations of the Purchase Orders and the obligations and rights resultant from the Purchase Orders. As identified in Xcoal's brief, Taglia will be permitted to testify to background issue of the coal industry, the parties' course of conduct in relation to industry standards, damages suffered by Xcoal due to United Coal's alleged breach, and critiques of Medine's damage opinions.

### B. Motion to Strike United Coal's Expert, Emily Medine

Xcoal argues that the Court should strike Medine's expert opinions regarding United Coal's alleged damages because: (1) both Purchase Orders expressly prohibit the recovery of lost profits, and (2) Medine's damages opinions are "irrelevant" as they only consider damages in the form of lost profits. Doc. 83 at 23–34. In particular, Xcoal requests that the Court strike the damages opinions in Medine's initial expert report, Doc. 85-46, her rebuttal report, Doc. 85-48, and the three supplements to her initial report, Docs. 85-49, 85-50, 85-51.[33] United Coal argues that: (1) Medine does not calculate lost profits as defined by New York law, and therefore the limited liability provisions of the Purchase Orders are inapplicable; and (2) that Medine also calculated resale damages. Doc. 90 at 51–54.

In order for expert testimony to be admissible under Fed. R. Civ. P. Rule 702, it must "both rest[] on a reliable foundation and [be] relevant to the task at hand." *Daubert*, 509 U.S. at 597. In order to be relevant, "a plaintiff's expert's 'damages opinions must correspond to [the p]laintiffs' theory of liability.'" *10110 Group, LLC v. Mt. Hawley*

---

[33] Xcoal does not seek to strike any opinions in Medine's "Supplemental Expert Report," which does not contain any opinions about United Coal's alleged damages. Doc. 85-47.

28

*Insurance Co.*, No. 23 Civ. 7179 (JMF), 2025 WL 415737, at *3 (S.D.N.Y. Feb. 6, 2025) (brackets in original) (quoting *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-MD-1720 (MKB), 2022 WL 14863110, at *23 (E.D.N.Y. Oct. 26, 2022)).  "[E]xpert testimony which does not relate to any issue in the case is not relevant, and, ergo, not helpful." *Tramontane v. Home Depot U.S.A., Inc.*, No. 15-8528, 2018 WL 4572254, at *5 (S.D.N.Y. Sept. 24, 2018) (quoting *Daubert*, 509 U.S. at 591). When a theory of damages has been foreclosed, courts have found expert testimony on the issue irrelevant, and therefore excludable. *See e.g. 10110 Group, LLC*, 2025 WL 415737 at *3 (excluding an expert's testimony on "continual normal operating expenses" after the court determined those damage were not recoverable).

First, with respect to resale damages, the Court finds that Medine sufficiently provided evidence of resale damages to prevent her testimony on the matter from being precluded.  In support of the argument that Medine "presented evidence of resale damages under § 2-706," United Coal points to calculations in Medine's initial report and her third supplemental report.  Doc. 90 at 53–54.  In her initial report, Medine calculates the revenue of Wellmore and Affinity Coal sales to third-party buyers after Xcoal had allegedly breached the Purchase Orders.  *See* Doc. 85-46 at 13–14 (stating that subsequent sales of Wellmore Coal generated $24.1 million of revenue and that subsequent sales of Affinity Coal generated $4.4 million of revenue).  Similarly, in her third supplemental report, Medine estimates the difference in revenue between Xcoal's expected performance under the Purchase Orders and subsequent sales of Wellmore and Affinity Coal.  *See* Doc. 85-51 at 5 (estimating that the difference was $22 million under the Wellmore Purchase Order and $1.5 million under the Affinity Purchase Order).

29

Though both of these calculations are caveated, Medine does undoubtedly provide resale revenue calculations. Doc. 85-46 at 8 ("While some of the revenues were offset with subsequent sales, there is no indication that such sales would not have occurred had Xcoal accepted deliveries of all contract volumes. In other words, United Coal could have made both sales, meaning the later sales [d]o not offset the missed tonnage."); Doc. 85-51 at 5 ("Xcoal continues to believe some of [United Coal's] losses should have been offset by United Coal's subsequent sales . . . In the [calculations] below, I assume the premise of Xcoal's position . . ." ).

Xcoal argues that Medine cannot provide testimony on resale damages, as she explicitly stated in her deposition that she does not offer an opinion on them. Doc. 95 at 18. While it is true that when asked, Medine stated that resale damages were not "particularly applicable in this setting" and that she was not offering an opinion on them, Doc. 103-1 at 6, Medine's expert reports do show resale damage calculations. Further, Xcoal appeared to acknowledge that Medine's reports contained resale figures, as in that same deposition, Xcoal questioned her about the data underlying her resale calculations. *Id.* at 9.

With respect to lost profits, Xcoal argues that the Purchase Orders prohibit the recovery of lost profit damages, and as such, Medine's damage opinions on lost profits should be struck. Doc. 83 at 26–31, 38. United Coal does not contest that the Purchase Orders limit lost profit damages, but rather argues that lost profits, as defined by New York law, are limited to damages based on collateral agreements, which United Coal does not seek. Doc. 90 at 51–53. Though the parties have argued the issue, the Court defers on this decision at this time because it has already ruled that Medine's resale damage

30

opinions will not be struck, and because it would benefit from additional briefing. *Industrial Technology Ventures LP v. Pleasant T. Rowland Revocable Trust*, 2015 WL 1924924, *14 (W.D.N.Y. 2015) ("The trial court has the right to exercise its discretion to deny a motion for summary judgment, even if it determines that a party is entitled to it, if, in the court's opinion, the case would benefit from a full hearing.") (citing 11 Moore's Federal Practice, § 56.41(3)(d)).

The Court will permit Medine to testify at trial as to both lost profit damages and resale damages. As this is a bench trial, if necessary, the Court may after the fact, discount Medine's testimony as it relates to lost profit damages and only consult her testimony with respect to resale damages. Accordingly, the Court DENIES Xcoal's motion to strike.

### C. Motions for Summary Judgment

United Coal requests that the Court grant partial summary judgment with respect to liability for its breach of contract claims, Xcoal's counter claims, and a majority of Xcoal's affirmative defenses. Doc. 75 at 8. United Coal does not seek summary judgment on damages. *Id.* Meanwhile, Xcoal requests summary judgment on both breach of contract claims, arguing that United Coal cannot establish recoverable damages. Doc. 83 at 11.

"[I]n order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F. 3d 279, 288–89 (2d Cir. 2019) (quoting *Express Industries & Terminal Corp. v. N.Y. Department of Transportation*, 93 N.Y.2d 584, 589 (NY. 1999). "Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the

31

plaintiff, (3) breach by the defendant, and (4) damages." *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F. 3d 793, 799 (2d Cir. 2011).

### 1. United Coal's Motion for Partial Summary Judgment

### a. Breach of Contract Claims

United Coal argues that the Purchase Orders are valid and enforceable contracts between the parties, that they were effective as of April 14, 2022, that expressly required Xcoal to purchase coal between April and June, 2022, and that Xcoal breached. Doc. 75 at 12–20. Xcoal argues that partial summary judgment should be denied because the Purchase Orders are, at minimum, ambiguous as to the effective date and the schedule for delivery. Doc. 83 at 42–61.

As a preliminary matter, "[p]arol evidence—evidence outside the four corners of the document—is admissible only if a court finds an ambiguity in the contract. . . . Furthermore, where a contract contains a merger clause, a court is obliged 'to require full application of the parol evidence rule in order to bar the introduction of extrinsic evidence to vary or contradict the terms of the writing.'" *Schron v. Troutman Sanders LLP*, 20 N.Y.3d 430, 436 (N.Y. 2013) (quoting Matter *of Primex Intl. Corp. v. Wal–Mart Stores,* 89 N.Y.2d 594, 599 (N.Y. 1997)). But parol evidence *may* be considered— notwithstanding a merger clause—when a court interprets ambiguous terms or language. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 69 (2d Cir. 2008) (finding that under New York law "'[e]ven though a document may be fully integrated with respect to the ultimate terms of the agreement, the meaning of those terms may remain unclear.' In such cases, it is proper to consider extrinsic evidence in interpreting the ambiguous terms, irrespective of the parol evidence rule.") (internal citations omitted).

32

"Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). When a contract term is unambiguous, as a general rule, a court may not rely on extrinsic evidence to "rewrite, under the guise of interpretation," that term. *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992). Whether the language of a contract is clear or ambiguous "is a question of law to be decided by the court." *Compagnie*, 232 F.3d at 158. Contract language is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Id.* (quoting *Sayers v. Rochester Telephone Corp. Supplemental Management Pension Plan*, 7 F.3d 109, 1094 (2d Cir. 1993)); *see also Goldman Sachs Group, Inc. v. Almah LLC*, 85 A.D.3d 424, 924 N.Y.S.2d 87, 90 (1st Dep't 2011) ("A contract is ambiguous only if 'the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings.'"). However, the language of a contract "is not made ambiguous simply because the parties urge different interpretations." *O.D.F. Optronics Ltd. v. Remington Arms Co.,* No. 08 Civ. 4746, 2008 WL 4410130, at *11 (S.D.N.Y. Sept. 26, 2008) (citation and internal quotation marks omitted).

Under New York law, "[a]mbiguity with respect to the meaning of contract terms can arise either from the language itself or from inferences that can be drawn from th[e] language." *Alexander & Alexander Services, Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir.1998). Although generally interpretation of ambiguous contract language is a question of fact to be resolved by the

factfinder, "'the court may resolve ambiguity in contractual language as a matter of law if the evidence presented about the parties' intended meaning [is] so one-sided that no reasonable person could decide the contrary.'"  *Compagnie*, 232 F.3d at 158 (internal citation omitted).

    *i.   The Effective Date*

United Coal argues that the Purchase Orders were dated and therefore effective on April 14, 2022. Docs. 75 at 21–22; 90 at 40.  Xcoal argues that the Wellmore and Affinity Purchase Orders were signed on June 13, 2022 and July 8, 2022, respectively, and therefore were not effective until those dates.  Doc. 83 at 44–49.

Where the plain language of a contract suggests that parties intended for the contract to apply retroactively, courts will give a contract retroactive effect.  *See e.g. Colello v. Collelo*, 9 A.D.3d 855 (N.Y. App. Div. 2004); *Sweeting v. Board of Co-op. Education Services*, 443 N.Y.S.2d 910 (1981); *see also* 2 Williston on Contracts § 6:79 (4th ed.) ("[W]here the parties themselves agree that a contract between them should be given effect as of a specified date . . . there is no sound reason why that agreement should not be given effect.").  Where a contract expressly provides that the contract was entered "as of" a date which predates signing, the contract will be applied retroactively.  *See Colello*, 9 A.D.3d at 857 ("It is fundamental that where parties to an agreement expressly provide that a written contract be entered into 'as of' an earlier date than that on which it was executed, the agreement is effective retroactively . . ."); *Viacom International Inc. v. Tandem Productions, Inc.*, 368 F. Supp. 1264, 1270 (S.D.N.Y. 1974) ("When a written contract provides that it shall be effective 'as of' an earlier date, it generally is retroactive to the earlier date").  However, even where there is not an express provision of

retroactivity or ensuring a contract is effective "as of" a date, courts can still find that the language of a contract expresses retroactive intent.  *Compare Sweeting v. Board of Co-op. Education Services*, 443 N.Y.S.2d 910 (1981) (finding a contract retroactive on its face where the date of the contract was prior to the execution of the contract, where there was an agreement that work was to commence on that prior date, and where the defendant presented no reason for denying retroactive effect) *with Lorica v. Krug*, 195 A.D.3d 1194 (N.Y. App. Div. 2021) (finding that a contract's effective date was ambiguous, precluding summary judgment, where the contract was dated to a time prior to the signature but the contract itself contained no express provision of intended retroactivity).

The Court finds that the language of the Purchase Orders does not unambiguously evince retroactive intent.  The Purchase Orders plainly have no "as of" language or other express retroactivity provision.  In their opening brief, United Coal cites *Collelo* and *Viacom* to argue that, where a contract is dated "as of" a prior date, courts will deem the contract retroactive to prior date.  Doc. 75 at 21.  While both the Wellmore and Affinity Purchase Orders are dated April 14, 2022 in two separate locations,[34] unlike the contracts in *Collelo* and *Viacom*, as there is no explicit provision indicating that the parties intended the contract to be effective "as of" April 14, 2022.  *Colello*, 9 A.D.3d at 857; *Viacom International Inc.*, 368 F. Supp. at 1270.

Further, the terms of the Purchase Orders do not unambiguously evince retroactive intent either.  The Court finds *Lorcia* persuasive on this matter.  195 A.D.3d

---

[34] The Purchase Orders are dated April 14, 2022 on the first page as well as at the beginning of the terms and conditions, which begin on the fourth page.  Docs. 77-3 at 10, 13; 77-5 at 2, 5.

1194 (N.Y. App. Div. 2021). In *Lorcia*, the Appellate Division found summary judgment inappropriate because the effective date of the contract at issue was ambiguous. *Id.* at 1197. Supporting retroactive application, the Court looked to the fact that the agreement was dated over four months prior to the signature date, the plaintiff signed his name "on a line next to where the date had been typed," and the plaintiff never objected to the date. *Id.* at 1196. On the other hand, the plaintiff asserted that he never intended retroactivity and the agreement itself did not address retroactivity or explicitly state an effective date. *Id.*

As shown by the face of the Purchase Orders, the Wellmore Purchase Order was countersigned on June 13, 2022, and its "Term", "Delivery Period", and "Tentative Delivery Schedule" indicate performance between April 14 and June 30, 2022. Doc. 77-3 at 10–12. The Affinity Purchase Order was countersigned on July 8, 2022, and its "Term", "Delivery Period", and "Tentative Delivery Schedule" indicate performance between June 1 and June 30, 2022. Doc. 77-5 at 2–4.

Supporting retroactive application are the facts that the Purchase Orders are dated months prior to their signature, Xcoal signed the Purchase Orders, and never objected to the April 14, 2022 date or the timing requirements under the Purchase Orders. Docs. 77-3 at 10, 13; 77-5 at 2, 5; 78 ¶¶ 120–21, 128–31; 84 ¶¶ 251–52. As United Coal correctly points out, the argument for retroactive application is stronger in this case than in *Lorcia*, because Purchase Order's "Term," "Delivery Period," and "Tentative Delivery Schedule," also indicate they were to take effect prior to their signatures. Doc. 90 at 43. United Coal argues that these terms, as well as the "time is of the essence" provision, would be rendered meaningless in Xcoal's interpretation of the Purchase Orders. *Id.* at

36

32–33.  However, as in *Lorcia*, the agreement is silent as to retroactivity and does not state an effective date, and Xcoal now argues they did not intend retroactivity.  *See Lorcia*, 195 A.D.3d at 1196.  Accordingly, the Court finds that the Purchase Orders are sufficiently ambiguous on their face as to preclude finding retroactive effect at summary judgment.[35]

While the Purchase Orders are fully integrated, as the effective date of the Purchase Orders is facially ambiguous, the Court considers extrinsic evidence provided by the parties.[36]   However, even looking to extrinsic evidence, the Court cannot as a matter of law resolve this ambiguity about the parties' intent because the evidence is not "so one-sided that no reasonable person could decide to the contrary."  *Compagnie Financiere de CIC et de L'Union Europeenne*, 232 F.3d, at 158 (internal citation omitted).

United Coal marshals substantial evidence to support its argument that parties understood the Purchase Orders to be retroactive, either to April 14, 2022 or to March 21, 2022, and not effective only on signing.  *See* Doc. 76-4 at 5 (noting that in his deposition, Xcoal employee Frank Kozlesky[37] answered "that's correct" when asked if the effective date of the Purchase Orders was April 14, 2022); *see also* Doc. 78 ¶ 54 (Popivchak email to Hutton on March 21, 2022 stated, "As discussed, I confirm the following coal purchase

---

[35] Unlike in *Sweeting*, the parties dispute whether the performance of the Purchase Orders was set to begin on the date of the contract, and further, Xcoal has presented arguments as to why the Purchase Orders should not be considered effective as of April 14, 2022 but on signature, as detailed in this section. *Sweeting*, 443 N.Y.S.2d at 915.

[36] The Purchase Orders contain a merger clause, which provides: "The Purchase Order . . . and these Terms and Conditions of Purchase . . . represent the entire agreement between Buyer and Seller and together create a binding contract upon the terms and conditions herein set forth." Docs. 77-3 at 14; 77-5 at 5.

[37] The parties do not define Kozlesky's role in their affirmative or responsive Rule 56.1 statements or briefs. In United Coal's reply 56.1 statements, they refer to Kozlesky as "Xcoal's executive in charge of contract administration."  Doc. 91 ¶ 16.

. . ."); *id.* ¶ 50 (noting that the quantities the Purchase Orders are the same as those detailed in Popivchak's March 21, 2022 email); *id.* ¶ 84–87 (indicating that in their depositions, Hutton and Schroder testified to the fact that, after March 21, United Coal ceased trying to sell the coal it had committed to Xcoal and prepared for shipments between April and June, 2023); *id.* ¶¶ 78–83 (indicating that after March 21, Xcoal updated it's internal "Ops Packet" to reflect upcoming shipments of coal in April and May, 2023); Doc 76-16 at 2–12 (showing dozens of text messages that Hutton sent to Popivchak beginning on April 11, 2022, repeatedly asking for updates on the status of upcoming train shipments and finalization of the Purchase Orders); Doc. 91 ¶ 337 (an April 26, 2022 email from United Coal's CEO, John Schroder, to Xcoal's CEO, Thrasher Sr., begins, "I wanted to reach out to you on the status of UCC getting cars for the loading of this first vessel, as this is starting to put us in a bind. . . . We planned this first vessel into our shipments and to this date there isn't any movement."); Doc. 76-21 at 10 (showing that Xcoal internally tracked unsigned contracts); Doc. 78 ¶ 155 (detailing that Xcoal has, in the past, shipped coal without signed agreements); *id.* 78 ¶ 176–181 (showing that an internal Xcoal memoranda sent on August 3, 2022 detailed a contractual commitment for 200,000 metric tons of Wellmore Coal in April–June, 2022).

However, Xcoal cites sufficient evidence to the contrary to put the effective date in dispute. *See* Doc. 87-5 at 2 (a May 1, 2022 Hutton email to Xcoal with a new draft of the Wellmore Purchase Order stating, "I believe we are very close and need to get this signed so we can ship."); Doc. 87-6 at 2 (a May 11, 2022 Hutton email to Xcoal with a new draft of the Wellmore Purchase Order stating in part, "We are very close and hopefully the attached works.  Please let me know asap, because we need to schedule

these trains."); Doc. 84 ¶ 222 (deposition of Thrasher Sr. indicating that the parties were still negotiating the Wellmore Purchase Order through June, 2022); Doc. 84 ¶¶ 262–265, 268 (noting that no coal was delivered until after the Purchase Orders were signed; no Wellmore Coal was delivered until June 20, 2022 and no Affinity Coal was delivered until July 14, 2022); *id.* 84 ¶ 229 (United Coal stated that it did not want to revise the Affinity Purchase Order until after the parties agreed on the Wellmore Purchase Order); *see also id.* ¶¶ 211–12 (noting that, pursuant to previous contract between United Coal and Xcoal, delivery of coal only occurred after the purchase order was signed).

United Coal's arguments to the contrary are unavailing at summary judgment. First, United Coal argues that under New York law, Xcoal was required to provide explicit reservation if it wanted the contracts to be effective only upon signature. Docs. 75 at 21–22; 90 at 41–43.

"Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document . . . In any given case it is the intent of the parties that will determine the time of contract formation." *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir. 1985). In order to determine whether the parties intended to be bound in the absence of a document executed by both sides, courts consider the four *Winston* factors: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.* "No single factor is decisive, but each

39

provides significant guidance." *Ciaramella v. Reader's Digest Association, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997).

Under the first *Winston* factor, Courts can look at whether the parties expressly reserved a right to be bound only by an executed agreement, or if their conduct revealed such an intent. *See Lyman v. New York & Presbyterian Hosp.*, No. 11 Civ. 3889 (AJN) (JCF), 2012 WL 6135354, at *5 (S.D.N.Y. Dec. 11, 2012) ("Although this factor is phrased in terms of 'express' reservations, courts—including the court in *Winston*—also analyze whether the particular facts and circumstances of the case . . . demonstrate an implied reservation of the right not to be bound until the execution of a written agreement."); *see e.g. Winston,* 777 F.2d at 81 ("Although neither party expressly reserved the right not to be bound prior to the execution of a document, language in the correspondence does reveal such an intent."). It is uncontested that Xcoal did not expressly reserve the right to be bound only by an executed agreement. Doc. 78 ¶¶ 120–21, 128–31. However, as detailed above, Xcoal has introduced sufficient evidence concerning the behavior of the parties to put the issue of whether parties intended to be bound only by the finalized Purchase Orders into material dispute.[38]

The second and third *Winston* factors both weigh against finding that the parties entered into a binding agreement prior to the execution of the Purchase Orders. With

---

[38] United Coal also argues that the Purchase Orders expressly state that they are effective even without signatures. Doc. 75 at 24. United Coal points to Section One of the Purchase Orders, which states "[a]nything herein to the contrary notwithstanding, delivery of coal after the date of this Purchase Order constitutes acceptance of this Purchase Order and all of the terms and conditions hereof . . ." *Id.*; *see* Docs. 77-3 at 13; 77-5 at 5. While this provision indicates that the parties intended to be bound by the Purchase Order without signatures if delivery of coal had occurred, there is no dispute that no coal had been delivered under either Purchase Order until after they were signed. *See* Doc. 84 ¶¶ 262–265, 268. Accordingly, this provision is insufficient to demonstrate that the parties intended to be bound to the Purchase Orders prior to their signing, as no coal had been delivered under either Purchase Order at that point.

respect to the second *Winston* factor, it is uncontested that there was no partial performance before the signing of the Purchase Order. *See* Doc. 84 ¶¶ 262–265, 268. With respect to the third *Winston* factor, courts look to whether there is "literally nothing left to negotiate." *Winston,* 777 F.2d at 83. However, the record shows that after Xcoal sent the initial Purchase Order drafts on April 15, 2022, both parties continued to exchange drafts. *See* Doc. 84 ¶¶ 235, 239, 243, 245, 248. Finally, the fourth *Winston* factor concerns whether the Purchase Orders are the type of contract that would require a signature to be binding. *See Acun v. Merrill Lynch Pierce Fenner & Smith, Inc.,* 852 F. App'x 552, 556 (2d Cir. 2021) ("The fourth *Winston* factor considers whether the agreement is of a type that is usually expressed in a written instrument."). The parties do not brief this factor directly. *See* Docs. 76-21 at 10 (showing that Xcoal internally tracks unsigned contracts and their first shipment date); 78 ¶ 155 (noting that Xcoal has previously shipped coal without a signed agreement). *But see* Doc. 84 ¶¶ 211–12 (noting that in a previous contract between United Coal and Xcoal, delivery of coal only occurred after the purchase order was signed). Accordingly, United Coal has not met its burden with respect to this argument at summary judgment.

Second, United Coal argues that under the N.Y. U.C.C. both parties were bound by the March 21, 2022 email from Popivchak to Hutton. Doc. 75 at 22. Generally, "a contract for the sale of goods for the price of $500 or more is not enforceable . . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. . . ." N.Y. U.C.C. Law § 2-201(1). An exception exists for merchants: When merchants make an oral contract, they can enforce it as long as one of the merchants makes a "writing in

confirmation of the contract" in a "reasonable time" and the other merchant did not object to the confirmation within ten days. *Id.* § 2-201(2). Further, even where "one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." N.Y. U.C.C. Law § 2-204.

United Coal is correct that confirmations between merchants can satisfy New York's Statute of Frauds, and that on March 21, 2022, Popivchak emailed Hutton to "confirm the following coal purchase." Doc. 78 ¶ 54. However, in this case, the parties undoubtedly subsequently signed fully integrated Purchase Orders after this confirmation email. *See* Doc. 84 ¶ 251–52. Xcoal correctly points out that United Coal cites no caselaw to support the argument that an initial merchant confirmation can have ongoing contractual effect when a fully integrated contract is signed after further negotiations. Doc. 83 at 50–51. Accordingly, United Coal has not met its burden with respect to this argument at summary judgment.

### i. Time for Performance

As a preliminary matter, United Coal correctly asserts that Purchase Orders state: "[r]egarding the delivery, time is of the essence." Doc. 78 ¶ 41. While it is well established that "where time is of the essence, performance on the specified date is a material element of the contract, and failure to perform on that date constitutes, therefore, a material breach of the contract," *New Colony Homes, Inc. v. Long Island Prop. Grp., LLC*, 21 A.D.3d 1072, 1073, 803 N.Y.S.2d 615, 616 (2005), Xcoal argues that the time

for performance itself is ambiguous.[39]  Xcoal asserts the provision is ambiguous because: the delivery schedule in the Purchase Orders was "tentative"; the parties' conduct during and following the execution of the Purchase Orders is inconsistent with the expectation that the parties could complete performance by June 2022; and interpreting the contracts to require performance by June 2022 was commercially unreasonable and impossible. Doc. 83 at 54–59.[40]

The Court examines the arguments pertaining to the contract language itself. First, the Court agrees with United Coal that the Purchase Orders' "Tentative Delivery Schedule" does not alone render the time for coal deliveries ambiguous.  *See* Doc. 90 at 31–33.  The Wellmore Purchase Order has a "Term" of April 14, 2022 through June 30, 2022; a "Delivery Period" of April through June 2022; and a "Tentative Delivery Schedule" calling for delivery and acceptance of 70,000 tons of Wellmore Coal in April and May 2022 and 60,000 tons in June 2022.  Doc. 77-3 at 10–12.  The Affinity Purchase Order has a "Term" of "June 1, 2022, through June 30, 2022"; a "Delivery Period" of "June 2022"; and a "Tentative Delivery Schedule" calling for the delivery of 20,000 tons of Affinity Coal in June 2022.  Doc. 77-5 at 2–4.  Reading these terms in unison, the Term and Delivery Period of the Purchase Orders specified the overall period of time during which coal deliveries were to occur, while the Tentative Delivery Schedule indicated a proposed, but more detailed, schedule of deliveries to be completed within

---

[39] Xcoal also argues that the clause only applies to United Coal, as under the Purchase Orders, United Coal is the only party which is required to "deliver" coal.  Doc. 83 at 56.  The Court does not evaluate this argument, as it denies United Coal's motion for partial summary judgment as to the breach of contract claims on other grounds, detailed below.

[40] Xcoal also argues that the disagreement as to the meaning of the time for performance calls into question whether there was the requisite meeting of the minds to establish a binding contract in the first place.  Doc. 83 at 59–61.  The Court does not address this argument, as it denies United Coal's motion for partial summary judgment as to the breach of contract claims on other grounds, detailed below.

43

the relevant Term and Delivery Period.  The fact that Xcoal and United Coal could mutually agree to modify the tentative delivery schedule set forth in Purchase Order in advance does not create ambiguity in the time of performance of the Purchase Orders. Docs. 77-3 at 13; 77-5 at 5.

However, assuming that the Purchase Orders were effective at the time of execution, the Court agrees with Xcoal that interpreting the time of performance as written would lead to an absurd and unreasonable result.[41]

It is a "well settled principle that a contract should not be interpreted to produce an absurd result, one that is commercially unreasonable, or one that is contrary to the intent of the parties." *Cambridge Capital LLC v. Ruby Has LLC*, 675 F. Supp. 3d 363, 390 (S.D.N.Y. 2023) (citing *Cole v. Macklowe*, 953 N.Y.S.2d 21, 23 (1st Dep't 2012)); *see also Wells Fargo Bank, N.A. v. Wrights Milll Holdings, LLC,* 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015) ("It is black-letter law that courts must reject interpretations of agreement provisions that are commercially unreasonable or illogical.").

The Wellmore Purchase Order was signed on June 13, 2022, calls for the delivery of 200,000 tons of Wellmore Coal and has a term of April 14, 2022 through June 30, 2022.  Docs. 78 ¶ 17; 77-3 at 10–12.  Xcoal contends that it was logistically impossible to fulfill the required tons of Wellmore Coal in the 17 days between signing the Purchase Order and June 30, 2022.  *See* Doc. 87-7 at 8 (in his deposition, Thrasher Sr. stated "I believe that both United Coal and Xcoal knew that it was physically impossible to fulfill the terms of the [Wellmore] [P]urchase [O]rder in 17 days").  United Coal contests this,

---

[41] As detailed above, the effective date of the Purchase Orders is a genuine issue of material fact to be decided at trial.  Therefore, taking the evidence in the light most favorable to Xcoal, this analysis assumes, *arguendo*, that the Purchase Orders are effective on the date the Purchase Orders were fully executed.

arguing that performance was not impossible given the speed at which Xcoal has previously accepted coal. *See* Doc. 91 ¶ 274. However, whether this was logistically impossible, and therefore not commercially reasonable, is a genuine dispute of material fact improper for summary judgment.

This argument is stronger with respect to the Affinity Purchase Order, which was signed *after* the time for performance had already expired. Docs. 78 ¶ 28; 77-5 at 2–4. The Affinity Purchase Order was signed on July 8, 2022, calls for the delivery of 20,000 tons of Affinity Coal in June 2022. *Id.* Interpreting the contract such that Xcoal was in breach the moment the contract went into effect is absurd and commercially unreasonable. Accordingly, the Court finds that the delivery periods in the Purchase Orders are sufficiently ambiguous to preclude summary judgment on United Coal's breach of contract claims. United Coal's motion for partial summary judgment on the breach of contract claims is therefore DENIED.

### b. Xcoal's Counterclaims

United Coal requests that the Court grant summary judgment as to both of Xcoal's counterclaims, which allege that United Coal, not Xcoal, breached the Purchase Orders. Doc. 75 at 39–40. United Coal argues that because Xcoal was the first to breach the Purchase Orders, under New York law, it cannot enforce the Purchase Orders against United Coal. *Id.* As detailed above, the Court has not found that Xcoal breached the Purchase Orders. Accordingly, United Coal's motion for summary judgment with respect to Xcoal's counterclaims is DENIED.

#### c. *Xcoal's Affirmative Defenses*

United Coal requests that the Court grant summary judgment to eight of Xcoal's eleven affirmative defenses.[42]  Doc 75 at 25–40.  The Court examines each in turn.

##### i.  *Impossibility or Impracticability*

United Coal requests summary judgment as to Xcoal's affirmative defense of impossibility, because according to United Coal, Xcoal has "no evidence to support this defense."  Doc. 75 at 29–32.  "Impossibility (also known as 'impracticability') is an affirmative defense under New York law against liability for nonperformance of a contractual obligation.  Impossibility excuses a party's performance only when the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible.  Moreover, the impossibility must be produced by an unanticipated event that could not have been foreseen or guarded against in the contract."  *Yodice v. Touro College & University System*, 767 F. Supp. 3d 86, 93 (S.D.N.Y. 2025) (citing *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 153 (2d Cir. 2023)).

Xcoal argues that it was impossible to perform under the Purchase Orders, "because they were not signed until shortly before or after the time for performance identified in the 'tentative delivery schedule.'"  Doc. 83 at 63.  Despite the fact that the Wellmore and Affinity Purchase Orders were signed on June 13, 2022, and July 8, 2022, respectively,  according to the Term, Delivery Period, and Tentative Delivery Schedule,

---

[42] The three affirmative defenses that United Coal does not directly challenge is Xcoal's first, seventh, and eleventh affirmative defenses.  *See* Doc. 64 at 13–14.  Respectively, those encompass Xcoal's allegations that United Coal failed to state a claim upon which relief can be granted, United Coal failed to take reasonable action to mitigate damages, and there is no reasonably certain remedy for violation of the Purchase Orders.  *Id.*

under both Purchase Orders, performance was to be completed in June 2022.  Docs. 78 ¶¶ 19–24, 33–35; 84 ¶¶ 251–52.  As discussed above, Xcoal has introduced evidence that performance within these timelines may have been logistically impossible when the Purchase Orders became effective.  However, impossibility arising solely from the terms of a contract itself is not the type of impossibility with which the impossibility doctrine refers.  For one, the alleged event which caused the impossibility—here signing the Purchase Orders—was within the parties' control, and not the result of an unforeseeable event.  *See Irobot Corp. v. Expeditors International*, No. 23-CV-0580 (SJB) (AYS), 2026 WL 809964, at *8 (E.D.N.Y. Mar. 24, 2026) ("The impossibility defense excuses a party's nonperformance when (i) 'the destruction of the subject matter of the contract or the means of performance makes performance objectively impossible,' and (ii) the impossibility was 'produced by an unanticipated event that could not have been foreseen or guarded against in the contract.'") (quoting *Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 153 (2d Cir. 2023)).[43]  Further, the alleged impossibility of performance was foreseeable and Xcoal could have guarded against it by requiring that the Term, Delivery Period, and Tentative Delivery Schedule of the Purchase Orders be updated.  *See Kel Kim Corp. v. Central Markets*, Inc., 70 N.Y.2d 900, 902 (1987) (finding that the doctrine of impossibility was inapplicable where the party could have foreseen and guarded against the event which caused impossibility).  Accordingly, United

---

[43] To the extent that Xcoal is arguing that United Coal's failure to modify the delivery schedule was the unanticipated external event contrary to the expectations of the written Purchase Orders, this argument is duplicative with Xcoal's counterclaims that United Coal was the party to breach the Purchase Orders.  *See* Doc. 83 at 65 ("Xcoal could not have foreseen that United Coal would ignore these clear provisions in the Purchase Orders and assert that, contrary to the express language, the delivery schedule was not tentative, but was fixed and binding, and, in the case of the Affinity Purchase Order, required the parties to go back in time to fulfil their obligations").

Coal's motion for summary judgment with respect to Xcoal's affirmative defense of impossibility is GRANTED.

### ii. Condition Precedent

United Coal requests grant summary judgment as to Xcoal's affirmative defense that the language of the Purchase Orders imposed a condition precedent, because according to United Coal, the Purchase Orders do not establish a condition precedent to performance. Doc. 75 at 36–38.

"A condition precedent is 'an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises.'" *Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co.*, 86 N.Y.2d 685, 690 (N.Y. 1995). "A contractual duty ordinarily will not be construed as a condition precedent absent clear language showing that the parties intended to make it a condition." *Kuhbier v. McCartney, Verrino & Rosenberry Vested Producer Plan*, 239 F. Supp. 3d 710, 734 (S.D.N.Y. 2017) (internal citations omitted).

"[C]onditions [precedent] are not favored under New York law, and in the absence of unambiguous language, a condition [precedent] will not be read into the agreement." *Maxim Group LLC v. Life Partners Holdings, Inc.*, No. 07 CIV. 8099 (LAP), 2008 WL 4185717, at *1 (S.D.N.Y. Sept. 4, 2008) (alterations in original) (citing *Ginnett v. Computer Task Group,* 962 F.2d 1085, 110 (2d Cir.1992)). "While specific, talismanic words are not required, the law nevertheless demands that conditions precedent be 'expressed in unmistakable language.'" *Bank of New York Mellon Trust Co. v. Morgan Stanley Mortgage Capital, Inc.*, 821 F.3d 297, 305 (2d Cir. 2016) (internal citations omitted). "If the language is in any way ambiguous, the law does not favor a

construction which creates a condition precedent." *Comerica Leasing Corp. v. Bombardier Inc.*, No. 16 CIV. 614 (PGG), 2019 WL 11027701, at \*6 (S.D.N.Y. Sept. 30, 2019) (citing *Ashkenazi v. Kent S. Associates*, LLC, 51 A.D.3d 611, 611 (2d Dep't. 2008)).

Xcoal argues that the Purchase Orders have a condition precedent, specifically, the final sentence in Section Three of the Purchase Orders, which states:  "[Xcoal] and [United Coal] will mutually agree in advance to modify the tentative delivery schedule set forth in this Purchase Order."  Doc. 83 at 67; *see* Docs. 77-3 at 13; 77-5 at 5.  Xcoal argues that the parties therefore had to agree to modify the tentative delivery schedule prior to the delivery of coal under the Purchase Orders.  *Id.*

However, the Court finds that this language does not unambiguously create a condition precedent, as is required under New York law.  *See Comercia*, 2019 WL 11027701, at \*6  ("If the language is in any way ambiguous, the law does not favor a construction which creates a condition precedent.").  In the sentence in question, the parties use the word "will" which, like "shall" typically refers to promises and not conditions.  *Compare Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1100 (2d Cir. 1992) (detailing that "[p]arties often use language such as 'if,' 'on condition that,' 'provided that,' 'in the event that,' and 'subject to' to make an event a condition") *with Parlux Fragrances, LLC v. S. Carter Enters., LLC*, 164 N.Y.S.3d 108, 119 (2022) (detailing that the word "shall" is typically associated with contractual promises, not conditional language).  The clearest reading of this sentence is that, *if* the parties seek to modify the tentative delivery schedule, they promise to do so in advance and by mutual

49

agreement. Accordingly, United Coal's motion for summary judgment with respect to Xcoal's affirmative defense of a condition precedent is GRANTED.

### iii. Mutual Mistake

United Coal requests summary judgment as to Xcoal's affirmative defense of mutual mistake because "there was no mistake, and even if there was, it was not mutual." Docs. 75 at 32–36.[44]

Under New York law, a mutual mistake occurs when both parties in a contract "'share the same erroneous belief and their acts do not in fact accomplish their mutual intent.' Importantly, 'the mistake must be so material that . . . it goes to the foundation of the agreement.'" *MV Realty PBC, LLC v. Innovatus Capital Partners, LLC*, 794 F. App'x 103, 106 (2d Cir. 2019) (internal citations omitted); *see Allen v. WestPoint-Pepperell, Inc.,* 945 F.2d 40 (2d Cir.1991) (stating that recission due to mutual mistake is appropriate where the parties, "shared the same erroneous belief as to a material fact, and their acts did not in fact accomplish their mutual intent."). "To demonstrate mutual mistake, the party claiming mistake must prove that the parties to the contract both 'shared the same erroneous belief as to a material fact' at the time that they entered into

---

[44] To the extent that Xcoal is arguing that its performance under the Purchase Orders is excused due to the *unilateral* mistake, that affirmative defense is foreclosed. *See* Doc. 83 at 65–67 (quoting caselaw related to both mutual and unilateral mistake). Generally, "[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." *Satchell v. Dilworth*, 745 F.2d 781, 784 (2d Cir. 1984) (internal quotation marks omitted). However, "a district court may . . . entertain [untimely] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility, or undue delay of the proceedings. In such circumstances, the district court may construe the motion for summary judgment as a motion to amend the defendant's answer." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350–51 (2d Cir. 2003) (citations omitted). In its answer to the complaint, Xcoal did not plead unilateral mistake. *See* Doc. 64 at 13–14. Xcoal does not argue that their opposition to the motion for summary judgment should be treated as a motion to amend their answer; and further, United Coal argues that they would be prejudiced by allowing such an amendment. Doc. 90 at 46 ("United Coal had no notice of—and therefore no opportunity to conduct discovery on—a defense of unilateral mistake."). Accordingly, the Court does not consider the affirmative defense of unilateral mistake.

the contract and that the contract thus failed to accomplish their mutual intent." *New York SMSA Ltd. Partnership v. City of Rye,* No. 19 CIV. 10159 (NSR), 2022 WL 2965981, at *7 (S.D.N.Y. July 27, 2022) (citing *Allen v. WestPoint–Pepperell, Inc.*, 945 F.2d 40, 46 (2d Cir. 1991)).

Xcoal argues that there was a mutual mistake regarding the meaning of the tentative delivery schedule in the Purchase Orders as Xcoal believed parties were required to modify it prior to performance, whereas United Coal did not. Doc. 83 at 65–67. This argument is unavailing.

First, this distinction is duplicative of Xcoal's argument that the tentative delivery schedule was subject to a condition precedent. To the extent that Xcoal is arguing that the parties were more generally mistaken as to the tentative delivery schedule, the term, and the delivery periods in the Purchase Orders, that too is unavailing. Xcoal has failed to provide evidence to show that United Coal was mistaken as to these terms.[45] Further, Xcoal has failed to demonstrate that the parties shared the *same* erroneous belief concerning the mistake, as its argument is premised upon different interpretations of the contract by the parties. Accordingly, United Coal's motion for summary judgment on the affirmative defense of mutual mistake is GRANTED.

### iv. Failure to Timely Tender Coal and Improper Termination

United Coal argues that because Xcoal has breached, it cannot succeed with its defenses that United Coal failed to timely tender coal and improperly terminated the

---

[45] As detailed above, Xcoal does cite sufficient evidence to create a material dispute as to whether the parties intended the Purchase Orders to take effect prior to their signing. However, that alone does not demonstrate that United Coal was mistaken as to the term, delivery period, or tentative delivery schedule in the Purchase Orders. Xcoal cites no additional evidence in arguing for mutual mistake. *See* Doc. 83 at 66–67.

Purchase Orders. Doc. 75 at 39–40. However, as detailed above, the Purchase Orders are ambiguous as they relate to the effective date and time for performance. Therefore, whether Xcoal breached the Purchase Orders is not an issue that can be determined at summary judgment. Accordingly, United Coal's motion for summary judgment with respect to the affirmative defenses of failure to mitigate and improper termination is DENIED.

### v. *Withdrawn Affirmative Defenses*

In its opposition, Xcoal withdraws its defense of accord and satisfaction, estoppel, failure of consideration, payment, unclean hands, waiver, force majeure, and interference of contracts. Doc. 83 at 63, 70. Accordingly, United Coal's motion for summary judgment with respect to each of these affirmative defenses is GRANTED.

### 2. *Xcoal's Motion for Summary Judgment*

Xcoal argues that United Coal cannot prove recoverable damages for its breach of contract claims because United Coal cannot seek lost profit damages as they are barred by the Purchase Orders, and relatedly, as Medine's testimony should be excluded, United Coal cannot offer proof of damages. Doc. 83 at 36–38. United Coal responds by arguing that Xcoal misunderstands lost profit damages under New York law; that it presents resale damages in addition to lost profit damages; and even if Medine's opinions were excluded, United Coal could offer additional witnesses to speak about damages. Doc. 90 at 51–54.

The Court first turns to the arguments concerning United Coal's ability to pursue resale damages. Xcoal argues that as because United Coal "only identified lost profit damages in its expert's report, interrogatory responses, and Rule 30(b)(6) depositions,

United Coal cannot now assert a completely different damages theory at the summary judgment or trial stage." Doc. 95 at 20.

"The general purpose of discovery is 'to inform the adversary of what theories a[] party proposes to 'develop' at trial, and on what basis a jury will be asked to award damages." *Utica National Insurance Co. of Ohio v. PVI Industries, LLC*, No. 6:22 Civ. 1231 (BKS) (PJE), 2025 WL 1448359, at *4 (N.D.N.Y. May 20, 2025) (citing *New Haven Temple SDA Church v. Consolidated Edison Corp.,* No. 94 Civ. 7128, 1995 WL 358788, at *5 (S.D.N.Y. June 13, 1995)).

On the one hand, Xcoal is correct that in its first set of interrogatory responses on November 13, 2023, when asked to provide calculations of "all damages" sought, United Coal only provided calculations for unmitigated damages as a lost-volume seller, Doc. 84 ¶ 314; that, Paul Gregory, testifying as United Coal's 30(b)(6) representative, indicated that they would rely on Medine's expert reports to calculate damages, Doc. 87-14 at 7; and that Medine, in her deposition indicated that she did not offer an opinion on resale damages. Doc. 103-1 at 6.

However, despite this, the Court finds that United Coal sufficiently informed Xcoal that it sought resale damages to avoid summary judgment on the issue. First, as detailed above, the Court finds that Medine sufficiently calculated resale damages in her expert reports. Further, United Coal did repeatedly indicate that it sought resale damages and provided data to support those calculations. In United Coal's April 20, 2023 pre-litigation settlement letter, it explicitly calculated resale damages; in its September 12, 2023 Rule 26(a)(1) initial disclosures, it similarly provided calculations for resale damages; in its April 15, 2024 response to Xcoal's second set of interrogatories, it

54

provided figures for resale revenue; in a follow up to that set of interrogatories, United Coal provided Xcoal with data to support calculation of resale revenue; and United Coal's two 30(b)(6) representatives who were deposed on February 6 and 7, 2025, also answered Xcoal's questions concerning the calculation of resale damages. Docs. 104-3, 87-53 at 6; 104-4; 87-14; 104-7. Xcoal was sufficiently informed about United Coal's calculation of its damages throughout discovery, and indeed, from the record, it is apparent that Xcoal, through its interrogatories and depositions, continued to question United Coal's resale calculations.

As to whether United Coal may permissibly recover lost profit damages for any alleged breach, as detailed above, the Court defers on this issue at this time. Accordingly, Xcoal's motion for summary judgment DENIED.

IV.    **CONCLUSION**

For the reasons set forth above, United Coal's motion to strike is GRANTED; United Coal's motion for partial summary judgment is GRANTED in part and DENIED in part; Xcoal's motion to strike is DENIED; and Xcoal's motion for summary judgment is DENIED.

The parties are directed to appear for a conference on April 28, 2026, at 11:00 a.m. in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY 10007.  The Clerk of Court is respectfully directed to terminate the motions, Docs. 74, 79, 82.

It is SO ORDERED.

Dated:    March 31, 2026
          New York, New York

_____
EDGARDO RAMOS, U.S.D.J.